IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MADISEN ULRICH,** an individual, | Civil Case No.: 1:20-cv- |
| Plaintiff, | |
| v. | |
| **319 BRAGG STUDENT HOUSING AUBURN AL LLC; GREYSTAR WORLDWIDE, LLC;** and **CSX TRANSPORTATION, INC.**, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

**COMES NOW** the Plaintiff, Madisen Ulrich, ("Madisen"), by and through her counsel of record, and files her Complaint against Defendants 319 Bragg Student Housing Auburn AL LLC ("Bragg"), Greystar Worldwide, LLC ("Greystar"), and CSX Transportation, Inc. ("CSX"), as follows:

## INTRODUCTION

1. This case arises from a horrifying pedestrian - train collision that occurred in Auburn, Alabama on October 4, 2018. On that fateful afternoon, a CSX freight train struck Madisen Ulrich as she crossed CSX's tracks that bisected her path from the campus of Auburn University to her apartment owned by Bragg. As will be shown, the Defendants' collective conduct, actions and omissions, combined and concurred to produce Madisen's devastating injuries.

2. This lawsuit seeks to hold the Defendants liable for their wanton misconduct. This case is brought to compensate Madisen for her devastating injuries; to provide justice for Madisen

and to cause the Defendants to bear the financial burden of their wrongdoing, rather than to shift that cost to society in general.

3. This lawsuit also seeks to punish the Defendants for their behavior. Punishment here is to deter these Defendants and to force them to make decisions that put safety and people ahead of profits. The goal of this punishment is to put similarly situated parties on notice that society will not tolerate this outrageous and reckless conduct. Ultimately, this lawsuit seeks to prevent what happened to Madisen Ulrich from ever happening to anyone else.

## PARTIES

4. Plaintiff Madisen Ulrich is an adult citizen and resident of the State of Alabama.

5. At all times relevant, Madisen was a student at Auburn University and a resident of the private student housing complex known as 319 Bragg.

6. Defendant 319 Bragg Student Housing Auburn AL LLC is a Delaware Limited Liability Company whose principal place of business is 222 S. Riverside Plaza, Suite 200, Chicago, IL. 60606.

7. Defendant Greystar Worldwide, LLC is a Delaware Limited Liability Company who maintains a significant presence through corporate offices in Chicago at 311 South Wacker Drive, Suite 5410, Chicago, Illinois, 60606. Defendant Greystar Worldwide, LLC is either the owner, manager, or operator of 319 Bragg.

8. Defendant CSX Transportation, Inc., is a Virginia Corporation who operates railroads serving over two-thirds of the population of the United States. CSX has significant commercial interests and is engaged in interstate commerce within this judicial district and division, including operating one of its largest rail yards in this district and division.

## JURISDICTION

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332, because all the parties to this action are citizens of different states.

## VENUE

10. Venue is proper in this district pursuant to 28 U.S.C.A. § 1391 for the following reasons:

    a. Because Bragg's primary place of business is within this district and Bragg is clearly a resident of this district pursuant to § 1391(c)(2).

    b. Greystar is engaged in extensive interstate commerce within this district and division through its corporate offices in Chicago on South Wacker Drive. Greystar employs numerous persons and conducts business on its own behalf for the benefit of others within this district. Greystar's contacts in this district would make it subject to Illinois' long-arm jurisdiction statute. Greystar is certainly within this Court's personal jurisdiction. Because of these factors, Greystar is clearly a resident of this district for venue purposes pursuant to § 1391(c)(2).

    c. CSX owns and operates one of its ten largest rail yards in this district and division. CSX owns and operates many miles of rail tracks within this judicial district and division. CSX engages in substantial economic activity within this district including employing residents of this judicial district and engaging in interstate commerce within this district. CSX is a common carrier, as defined by law, operating in this district. As such, CSX is clearly within this Court's personal jurisdiction. Because of these factors, CSX is clearly a resident of this district for venue purposes pursuant to § 1391(c)(2).

## FACTS

**A.**     **Bragg and the Location.**

11. Bragg is a private student housing complex located at 319 Bragg Avenue in Auburn, Alabama.

12. Bragg, boasting its location is "just steps away from Auburn University," is geographically located in such a position that student residents who walk to classes at Auburn University are openly directed and encouraged to cross CSX's rail line on foot as one of Bragg's selling points.

13. Hundreds of university students reside at Bragg and many of them cross CSX's rail line on foot multiple times a day.

14. There is a gate located at the edge of Bragg's property that abuts the right of way for CSX's rail line. The university students who reside at Bragg use this gate as a shortcut to reach the tracks and cross them on their way to classes. Bragg has full knowledge that its residents continuously use this gate as a path to and from campus.

15. This gate dumps the residents of Bragg directly onto the CSX right of way where the students then traverse the railroad tracks on their way to class. Upon return from class the students follow the same route back across the tracks to enter the gate to Bragg.

16. There are numerous pedestrian pathways in this area that are highly visible to CSX employees as they traverse these tracks multiple times a day. On Bragg's side of the tracks numerous footpaths converge at Bragg's gate along CSX's right of way.

**B.     CSX.**

17. In addition to Bragg's knowledge that its gate is continuously used as a path to and from campus by its student residents, CSX is also aware of the pedestrian footpaths across its tracks at this location.

18. This is because CSX runs numerous freight trains down this line every day. Each of CSX's engines are equipped with cameras that record the complete run of the train on each trip.

In addition, CSX equips each train with a "black-box" to retain critical data from each run which records the video for review and preservation by CSX.

19. CSX refers to anyone upon its right of way as a trespasser. In fact, CSX often defends itself in train versus pedestrian collision cases by seeking to impose upon the victim the legal status of trespasser for contributory or comparative negligence purposes.

20. However, CSX had, at all times material to this case, full knowledge that pedestrian "trespassers" are the single largest source of accidents with trains in the United States. In fact, this is common industry knowledge with longstanding obligations to mitigate the risk of trespassers and train pedestrian collisions.

21. In 2008, CSX's regulator, the Federal Railroad Administration ("FRA"), conducted its first [Right of Way Fatality and Trespass Reduction Workshop](), ("First Workshop"). A final report of this event was published by the FRA in February 2009.

22. This First Workshop report includes information demonstrating that CSX was an attendee and participant in this program and gave presentations at this workshop.

23. The First Workshop reported that "[g]rade crossing and rail trespasser incidents continue to cause a large proportion of the deaths associated with railroading. Greater than half of all the fatal injuries on United States railroads are sustained by trespassers. In 1990 the number of trespassers who died on rail rights-of-way exceeded 500 for the first time. Since 1996 trespasser fatalities have exceeded fatalities at grade crossings as the largest category of rail-related deaths (see Figure 1)." (See page 2 of the FRA Workshop report).

24. The First Workshop concluded with an understanding that the industry needs to continue its work to reduce pedestrian train collisions.

25. In 2011, the FRA issued a final report titled "Railroad Infrastructure Trespass Detection Performance Guidelines" (hereinafter the "Trespass Report").

26. The Trespass Report was provided to all railroads. Section 2 of the Trespass Report indicates that trespass on railroad right of ways has long been a safety concern since many tragic incidents involve children and young adults. The statistics provided in the Trespass Report showed that trespass-related fatalities have not decreased over the years.

27. Section 2.1 of the Trespass Report laid out factors that contributed to trespassing on right of ways:

    a. Accessibility (poor or no fencing, no landscaping, proximity to school, or other heavily trafficked attractions);

    b. Poor visibility (curve/crest near accessible areas, location not easily visible from nearest road or developments); and

    c. Shortcut potential (fastest way between popular destinations).

28. The Trespass Report indicates that once a location where trespassing is occurring has been identified, the railroad should conduct a site survey and identify countermeasures to reduce or eliminate trespassing.

29. The Trespass Report indicates that barriers and dedicated pedestrian paths over or under the right of way are effective long-term countermeasures.

30. In August of 2012, the FRA published a report that followed its second "Right of Way Fatality & Trespass Prevention Workshop" (2012 Workshop).

31. The 2012 Workshop found that trespassing was the leading cause of rail-related deaths in America and, in general, most trespassers are pedestrians who use railroad tracks as a shortcut.

32. Both workshops acknowledged that distracted behavior, including use of electronics, was a known contributor to train pedestrian accidents.

33. In addition to the Trespass Report, the FRA published a fact sheet in February of 2013 which stated that the railroad operating environment is one that is inherently hazardous for the general public and warned the general public should avoid railroad right of ways. This fact sheet also noted that trespassing was the leading cause of rail-related deaths with more than 400 annually and nearly as many injuries. The fact sheet noted the vast majority of these injuries and deaths are preventable. In addition, the fact sheet stated that Railroads should develop specific trespass countermeasures with local communities when possible.

34. In July of 2014, the FRA published a final report titled "Trespass Prevention Research Study – West Palm Beach, FL" (hereinafter "Trespass Study"). The Trespass Study's background noted that "[t]he rail ROW often provides an easy, yet illegal, shortcut to many walking destinations. While notable progress has been made in the past 10 years to improve safety along rail ROWs, trespass-related fatalities have remained the biggest safety issue facing the rail network."

35. In November of 2014, the FRA published a final report titled "Trespass Event Risk Factors." The executive summary of this report stated "[t]respassing incidents are one of the most prevalent types of railroad safety occurrences, resulting in more deaths than any other railroad type of accident and affecting all segments of the national population. Given the persistent nature and magnitude of the problem, any new insights into trespassing incidents and their prevention could bring measurable benefits to the railroad community and society as a whole."

36. The introduction to the November 2014 report states: "[t]respassing accidents are one of the most prevalent types of railroad accidents, result in more deaths and life-changing

injuries than many other railroad accident types, and affect all strata of the national population." Section 3 of this Report also provided a number of known factors influencing pedestrian collisions in train right of ways including the intoxication of the pedestrian from use of drugs or alcohol, the use of headphones or other electronic devices, and that 38.5% of these incidents involve persons attempting to cross the train tracks.

37. The November 2014 report also provided a description of high-risk locations: ease of access to the right of way, shortcut potential, unauthorized access or route across the right of way, visible "rabbit paths" across the right of way especially near parking lots, areas near parks and schools, areas with high service frequency, locations with many trespassers.

38. The November 2014 report also provides data demonstrating that CSX was involved with 773 pedestrian and train collisions between 2008 and 2012. In addition, section 5.2.2 of the November 2014 report indicated a number of trespassers caught on video were utilizing a well-worn footpath.

39. The FRA also authored another report in November 2014 titled "Countermeasures to Mitigate Intentional Deaths on Railroad Rights-of-Way: Lessons Learned and Next Steps." This report will be referred to as the "Gabree Report" for one of its author's names.

40. While the Gabree Report was primarily focused on cutting off incidents of "suicide by train" the materials relevant to this point are also relevant to other train pedestrian collisions since the report notes that "[s]uicide and trespasser fatalities have nearly identical impact on the railroad industry in terms of cost or delays." The Gabree Report's goal was to provide a comprehensive list of countermeasures and document critical research and evidence regarding their implementation.

41. Section 3.3 of the Gabree Report notes that physically blocking access to the right of way serves the purpose of preventing suicides and trespassing events generally. The Gabree Report notes that while barriers such as fencing are not economically practical throughout the entire rail network it may be practical to employ barriers in high-risk areas or "hotspots." Fencing is currently used in the United States in places where trespassing is a known problem. The Gabree Report notes that there are no studies demonstrating the effectiveness of fences on prevention of suicide but that common sense indicates suicide by train is not possible where the right of way cannot be accessed. The Gabree Report found that fencing would help prevent trespassing and suicide by train for freight railroads if used appropriately. The Gabree Report noted that freight railroads would have to identify trespassing hotspots for fencing due to the expansive nature of their lines.

42. A review of the entire Gabree Report shows that fencing is the only reliable means of stopping trespassing events at hotspot locations that is both feasible for railroads and effective.

43. The Gabree Report also noted in Section 3.4.3 that speed restrictions in trespassing hotspots provided additional time for trespassers to avoid being struck by trains. The report found reducing speed was a feasible countermeasure but its effectiveness was hard to determine.

44. The FAR published a final report in May 2017 from its 2015 Right of Way Fatality and Trespass Prevention Workshop, ("2015 Workshop"). The introduction provided in this report also confirms that "[t]respassing along railroad rights-of-way (ROW) is the leading cause of rail-related deaths in America. Generally, most trespassers are pedestrians who use railroad tracks as a shortcut. More than 500 trespass fatalities and nearly as many injuries occur in the United States every year with the vast majority of these events being preventable." In other words, from the First Workshop to the Third Workshop, over a period of eight years, the number of deaths and injuries

9

from train pedestrian crashes remained steady in number and remained the leading cause of rail-related deaths.

45. These authorities demonstrate that CSX was on general notice that collisions with pedestrians was the most likely form of train accident and that any such accident would certainly result in either death or traumatic physical injuries.

46. CSX was on general notice that pedestrian train collisions would be with persons identified by CSX as trespassers. CSX was also on general notice that most pedestrians involved in train collisions would be distracted or intoxicated which would affect their appreciation of their potential danger.

47. CSX also had specific notice, both actual and constructive, that the area near Bragg was a trespassing hotspot. This notice was derived from the observations of its own crews, the recordings of its cameras, the highly visible "rabbit-paths" across its tracks and the gate from Bragg's private property onto its right of way which CSX allowed to exist for a period of years without any apparent objection. All of this information constitutes multiple forms of notice that pedestrians were frequently crossing CSX's tracks in the area of Bragg's property.

48. In addition, CSX knew that there was no sanctioned pedestrian crossing in the area of Bragg such as a pedestrian overpass, a concrete sidewalk at the grade crossing, or any other method to safely allow pedestrians to cross these tracks without entering CSX's right of way.

49. CSX had general notice from its regulator that its rights of way were inherently dangerous for any pedestrians, including trespassers.

50. CSX also knew that there were no countermeasures in place to prevent the hundreds of daily crossings by pedestrians near Bragg. Each of these crossings CSX would consider to be a

10

trespass. CSX knew almost all these pedestrians were college students who fit the demographic profile of the persons most likely to be struck by a train.

51. Despite having notice and knowledge of the inherently dangerous nature of a rail right of way to the general public, CSX did nothing to prevent hundreds of daily instances of trespassing in the area of the Bragg property for years.

52. In spite of all this notice regarding frequent and continuous pedestrian crossings near the Bragg property, CSX continued to drive its trains through this area of high pedestrian trespass events at its maximum authorized speed.

**C.     Madisen - October 4, 2018.**

53. CSX allowed this condition to persist for a period of years prior to striking Madisen with its train and causing her severe, debilitating, life-altering injuries from which she will likely never recover.

54. A collision with a pedestrian at this "trespassing hotspot" was as foreseeable for CSX as the setting of the sun in the evening. Yet CSX did nothing to prevent the trespassing of its property hundreds of times a day near Bragg's property in the area of Bragg's gate.

55. CSX's train struck Madisen on the afternoon of October 4, 2018 as Madisen was walking back to Bragg from her classes. At the time CSX's train struck Madisen she was on her phone talking to her mother while attempting to cross CSX's tracks via her usual and customary path, as she had done hundreds of times before.

56. Of course, Madisen's path was directly through the pedestrian trespassing hotspot created by Bragg's gate and ignored by CSX for years.

57. Two of the three factors identified in the FRA's Trespass Report were present at the location where Madisen was struck by CSX's train:

11

a. First, the right of way was easily accessible. The FRA noted that factors affecting accessibility included a lack of fencing, proximity to school, or other heavily trafficked area; and

b. Second, the area has shortcut potential as it was the fastest way between Auburn's campus and Bragg.

58. Each of the following factors attributed to the description of high-risk locations found in the November 2014 Trespass Event Risk Factors report were present at the location where Madisen was struck: ease of access to the right of way, shortcut potential, unauthorized access or route across the right of way, visible "rabbit paths" across the right of way especially near parking lots, areas near parks and schools, areas with high service frequency, locations with many trespassers.

59. CSX had knowledge of this inherently dangerous condition and took no steps to avoid a collision with pedestrians at this industry defined "hotspot" of pedestrian "trespassing."

60. Had CSX installed a barrier to prevent trespassing in this hotspot, it would not have been possible for a pedestrian to enter CSX's right of way.

61. Had CSX installed a pedestrian overpass there would have been a safe alternative allowing pedestrians to cross CSX's tracks that did not require hundreds of college students to risk life and limb to walk to class every day.

62. CSX had superior knowledge of the inherent danger posed by pedestrians crossing its tracks, the frequency of train pedestrian collisions, and the enhanced danger of this type of collision at a pedestrian trespassing hotspot.

63. CSX was aware that college students are in the demographic of persons most likely to be involved in a pedestrian train accident.

64. CSX was aware that any pedestrians crossing its tracks would likely be distracted either by electronic devices or intoxication and therefore much more likely to not hear or see a train approaching.

65. CSX was fully aware that any pedestrian struck by its train would likely be killed or suffer devastating injuries.

66. In other words, when Madisen's life was forever altered by CSX, Madisen was right where CSX expected her or any other trespasser to be, i.e. using a well-worn footpath across the tracks as a shortcut to an attractive destination in a pedestrian trespassing hotspot.

67. Madisen was also in the exact condition all the data in CSX's possession said she would be, i.e. distracted and unable to appreciate her peril, at the time CSX's train struck her and changed her life forever.

68. In fact, CSX could have predicted this accident down to how it occurred from all its accumulated general and specific knowledge about pedestrian collisions and trespassing hotspots before Madisen was struck.

69. Despite this knowledge, CSX could not even be bothered to take its foot off the throttle to pass through a known "trespassing hotspot" in an effort to mitigate the chances of a pedestrian collision. In fact, CSX did nothing to mitigate the chances of a collision. Instead, CSX rested in the belief it could place the blame on any pedestrian for a pedestrian train collision in this "trespassing hotspot."

70. Greystar, as owner and/or manager of Bragg, has respondeat superior liability for the wrongdoing of its agent, or is directly liable for its own wrongdoing, for creating a man trap by opening a gate onto CSX's right of way and inviting the tenants of Bragg to risk their lives trying to simply go to their college classes. This man trap dumped hundreds of residents of Bragg

directly into an inherently dangerous railroad right of way every day of classes while these students walked to campus.

## DAMAGES

71. Madisen repeats and realleges all allegations contained in the prior paragraphs.

72. At the time CSX's train struck Madisen, she was in good health, was a loving and caring family member, and had her entire future in front of her.

73. CSX's train caused Madisen massive injuries. She suffered numerous fractures throughout her body, closed head injuries including traumatic brain injuries, she underwent multiple surgeries and long periods of rehabilitation. Madisen has lived through immense pain and suffering, along with mental distress including anxiety and depression. Also, Madisen's mood, demeanor and personality have changed, and she has suffered profound emotional distress.

74. It is expected that Madisen will continue to experience conscious pain and suffering, mental anguish, altered mood, demeanor, and personality. Madisen's ability to live a normal life and have the career and life experiences that she would have normally been expected to enjoy is forever altered, limited, and changed. It is expected that Madisen will suffer from the effects of her injuries for the rest of her life.

75. In addition, Madisen will suffer diminished earning capacity and will require some assistance with her activities of daily living on a going forward basis.

76. By reason of the foregoing, Madisen has sustained economic and non-economic damages for which she seeks an award of compensatory damages. The full extent of her compensatory damages is measured in the millions of dollars.

77. In addition, Madisen contends that the Jury should punish the Defendants for their actions and omissions in this case. Madisen contends that the Defendants actions are reckless, wanton and outrageous.

78. Based upon the facts of the case, Madisen will ask the Jury to award such an amount of punitive damages as will properly punish these Defendants and deter similarly situated parties from engaging in such behavior.

**FIRST CAUSE OF ACTION**
**Wantonness as to CSX**

79. Madisen repeats and realleges all allegations contained in the prior paragraphs.

80. Prior to CSX's train striking Madisen, CSX was fully aware that the leading cause of fatalities and injuries for railroads involved train pedestrian collisions. CSX was fully aware these pedestrians would be considered trespassers on its property.

81. Prior to CSX's train striking Madisen, CSX knew that the area of its track near Bragg was a "hotspot" for pedestrians to cross its rail tracks with hundreds of daily crossings CSX would label as trespassing incidents.

82. Prior to CSX's train striking Madisen, CSX knew that there was no "official" pedestrian crossing in this area that was safe for pedestrians to cross its railroad tracks. In other words, there was no pedestrian overpass or even a sidewalk at the grade level crossing.

83. Prior to CSX's train striking Madisen, CSX knew that hundreds of college students were crossing its tracks in these areas at all times of the day and night.

84. Prior to CSX's train striking Madisen, CSX knew that Bragg had a gate at the back of its property that allowed Bragg residents to walk directly onto CSX's right of way for purposes of crossing CSX's tracks.

85. Prior to CSX's train striking Madisen, CSX knew that in areas of high pedestrian traffic that CSX trains would certainly encounter pedestrians who were distracted.

86. Prior to CSX's train striking Madisen, CSX knew that distracted pedestrians were most often the parties injured and killed in pedestrian train collisions.

87. Prior to CSX's train striking Madisen, CSX knew that college aged people were in the demographic of individuals most likely to be involved in a pedestrian train collision.

88. Prior to CSX's train striking Madisen, CSX undertook no effort to erect any barrier to trespassing in the area of Bragg's property.

89. Prior to CSX's train striking Madisen, CSX undertook no efforts to eliminate or mitigate this pedestrian "trespassing" hotspot.

90. Prior to CSX's train striking Madisen, CSX did not construct a safe pedestrian overpass to serve the pedestrian population crossing its track at this location hundreds of times a day.

91. Prior to CSX's train striking Madisen, CSX could not even be bothered to reduce its trains' speed by even five miles an hour while passing through this pedestrian crossing hotspot.

92. Prior to CSX's train striking Madisen, CSX continued to barrel through this area of a densely populated college campus at its maximum allowable speed despite the everyday presence of college students crossing its tracks near Bragg's property hundreds of times daily.

93. Prior to CSX's train striking Madisen, CSX did all of these things with full knowledge that when it eventually struck one of these students they would likely be on their phone, or otherwise distracted, and completely oblivious to their imminent peril.

94. Prior to CSX's train striking Madisen, CSX knew that it was not a matter of if one of its trains would strike a pedestrian near the Bragg property, it was a matter of when there would be a pedestrian train collision.

95. Prior to CSX's train striking Madisen, CSX had allowed this inherently dangerous condition to exist continuously for a period of years and had done nothing to mitigate the risk to its own employees and those persons CSX deemed as trespassers who were utilizing this "trespassing hotspot" on its right of way hundreds of times a day.

96. Prior to CSX's train striking Madisen, CSX knew that either fatal or life altering injuries would likely result from any train pedestrian collision.

97. Prior to CSX's train striking Madisen, CSX did absolutely nothing to prevent the inevitable collision with a pedestrian in the area of Bragg's property.

98. Prior to CSX's train striking Madisen, CSX knew of this inherently dangerous condition and was recklessly indifferent to the consequences of its failures to stop the trespassing and its conscious decision to do nothing to mitigate or prevent trespassing even though CSX knew that eventually one of its trains would strike a pedestrian in this area and that the pedestrian would be killed or gravely injured.

99. CSX's actions in this case are reckless and wanton.

100. CSX's conduct is a proximate cause of the harms suffered by Madisen.

101. As a result of CSX's wantonness, Madisen was struck by CSX's train and suffered the injuries and damages set out in paragraphs 71-78 herein.

102. Madisen demands a sum of compensatory and punitive damages as a jury deems reasonable and may award.

## SECOND CAUSE OF ACTION
### Wantonness as to Bragg and Greystar

103. Madisen realleges all prior paragraphs as if set out here in full.

104. Bragg and Greystar provided a gate to the residents of Bragg that opened onto the right of way of CSX.

105. Bragg offered this gate as a path for residents to walk to class with full knowledge that residents, such as Madisen, would go out of this gate directly onto CSX's right of way, and then cross CSX's track.

106. Bragg and Greystar knew or should have known that CSX's right of way is inherently dangerous for pedestrians.

107. Bragg and Greystar knew or should have known that inviting its residents, such as Madisen, to trespass upon CSX's right of way created an unreasonable risk of harm to all its residents, including Madisen.

108. Despite this knowledge, Bragg created this "man-trap" for its residents, including Madisen, and then perpetuated its existence with full knowledge that using this gate would likely lead to severe injury or death for some resident of Bragg.

109. Bragg allowed this unreasonably dangerous condition to persist with reckless disregard for the injuries and harm that would result from using this private crossing of CSX's tracks.

110. Bragg did not have CSX's permission to create this private crossing, but still chose to create and have its residents utilize this private crossing despite the unreasonable danger of doing so.

111. Bragg's creation of this private crossing was a proximate cause of injury and harm suffered by Madisen.

112. As a result of Bragg's wantonness, Madisen suffered the injuries set out in this complaint at paragraphs 72-76.

113. Madisen demands such an award of compensatory and punitive damages as a jury deems reasonable and might award.

## PRAYER FOR RELIEF

WHEREFORE, Madisen demands judgment against the Defendants, separately and severally, as hereinafter set forth:

1. For such an amount of compensatory damages as a jury deems reasonable and may award, such number is expected to be in the millions of dollars and includes damages for economic and non-economic damages;

2. For interest upon any judgment entered as provided by law;

3. For costs of suit incurred herein;

4. For punitive damages, based on the wanton misconduct and conscious disregard for lives and safety described above; and

5. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury of all issues so triable.

*Respectfully submitted,*
**MADISEN ULRICH**

*/s/ Nick Wooten*
Nick Wooten
Nick Wooten, LLC
5125 Burnt Pine Drive
Conway, Arkansas 72034
(833) 937-6389
nick@nickwooten.com

*Counsel for Plaintiff*